UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

UNITED STATES OF AMERICA,

    v.

DANIEL RODRIGUEZ,                                    20-CR-150-LJV-HKS
                                                     DECISION & ORDER
         Defendant.

———————————————————————


      The defendant, Daniel Rodriguez, was charged in a two-count indictment with

possessing cocaine and cocaine base with intent to distribute those substances in

violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2.  Docket Item 10.

The case was assigned to this Court, and on October 6, 2020, this Court referred the

case to United States Magistrate Judge H. Kenneth Schroeder, Jr.  Docket Item 12.

      On January 15, 2021, Rodriguez moved to suppress his statements to law

enforcement because, he argued, they were elicited in violation of his previously

invoked right to remain silent.  Docket Item 19 at 34.  On July 23, 2021, he also moved

to suppress evidence seized from the vehicle in which he was a passenger and from his

home at 120 Center Avenue, North Tonawanda, New York, because, he claimed, the

search warrant issued by Erie County Court Judge Kenneth F. Case lacked probable

cause.  Docket Item 43.  The government responded to those motions on January 29,

2021, Docket Item 20, and August 5, 2021, Docket Item 44, respectively.  Judge

Schroeder heard oral argument on August 18, 2021, and he scheduled an evidentiary

hearing on Rodriguez's motion to suppress his statements.  *See* docket entry on August

18, 2021.

Before that hearing took place, however, Rodriguez and a co-defendant, Adrienne Czosnyka, were charged in a five-count superseding indictment.   Docket Item 50.  Rodriguez and Czosnyka both were charged with conspiring to possess with intent to distribute and to distribute at least 500 grams of cocaine and to maintain premises to manufacture, distribute, and use cocaine, all in violation of  21 U.S.C. § 846 (Count 1); possessing with intent to distribute at least 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and 18 U.S.C. § 2 (Count 2); maintaining drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2 (Count 3); and possessing a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2 (Count 4).  *Id*.  Rodriguez also was charged with possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count 5). *Id*.

Judge Schroeder therefore entered a new scheduling order for motions, Docket Item 53, and the deadlines in that order were adjourned several times at Czosnyka's request*, see* Docket Items 57-65.  After motions were made and Judge Schroeder heard oral argument, the evidentiary hearing on Rodriguez's motions, now joined by Czosnyka, was finally held on July 7, 2022.[1]  Docket Items 71, 72 (transcript).

_____

[1] Czosnyka moved to suppress her statements to law enforcement as well as the evidence seized from her vehicle, arguing that the stop of her vehicle and subsequent search was illegal.  Docket Item 66.  In her motions, Czosnyka joined Rodriguez's motion to suppress evidence "obtained as the result of the warrant in all places."  Docket Item 66 at 9.  In his Report, Recommendation and Order addressing Czosnyka's motions, Docket Item 81, Judge Schroeder said that his findings and recommendations in his Report, Recommendation and Order on Rodriguez's motion to suppress, Docket Item 80—that is, the motion at issue here—constituted his findings and recommendations on her motion to join in Rodriguez's motion.  Docket Item 81 at 9.

Two witnesses testified for the government—Tonawanda Police Department Detectives Mark Scranton and Mark Muscoreil—and seven exhibits were admitted into evidence during the government's case.  Dockets Items 72, 95.  Other than by submitting an affidavit in support of his motions, Docket Item 27, Rodriguez did not present any evidence or call any witnesses at the hearing.

After two extensions of time requested by Rodriguez were granted, Docket Items 73-76, both sides filed post-hearing memoranda on October 19, 2022, Docket Items 77, 78.  On December 16, 2022, Judge Schroeder issued his Report, Recommendation and Order ("RR&O"), finding that Rodriguez's motions to suppress his statements, Docket Item 19, and other evidence, Docket Item 43, should be denied.  Docket Item 80.  Judge Schroeder concluded that: 1) Rodriguez had knowingly and voluntarily waived his right to remain silent after he was advised of his rights and therefore was not unlawfully interrogated by either Detective Muscoreil or Detective Scranton; and 2) the search warrant issued for 120 Center Avenue was supported by probable cause.  *Id*.  In reaching those conclusions, Judge Schroeder found that the two witnesses who testified on behalf of the government were credible.  *Id*. at 5.

After Rodriguez asked for and was given a thirty-day extension of time, he objected to the RR&O on January 13, 2023.  Docket Item 85.  The government responded on January 26, 2023, Docket Item 87, and Rodriguez replied on February 3, 2023, Docket Item 89.  After a brief adjournment at the request of the parties, this Court heard oral argument on March 3, 2023.  Docket Item 92.  On April 3, 2023, both sides filed supplemental briefing that had been requested by the Court.  Docket Items 93, 94.

3

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3). The court must review *de novo* those portions of a magistrate judge's recommendation to which a party objects. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3).

This Court has carefully and thoroughly reviewed the RR&O, the objections, the response, the supplemental submissions, and the materials submitted to Judge Schroeder, including the transcript of the evidentiary hearing and the exhibits. Based on that *de novo* review and for the reasons that follow, with one minor exception this Court accepts and adopts Judge Schroeder's RR&O.

## FACTS[2]

On September 9, 2020, Town of Tonawanda Police Department Detective Jeffrey Campanella applied to Erie County Court Judge Kenneth F. Case for a search warrant. Docket Item 44-1. More specifically, the application requested a warrant to search 120 Center Avenue, North Tonawanda, New York; the person of Daniel Rodriguez; and a green Jeep Grand Cherokee (Registration No. JRH1094) in connection with the investigation into a burglary and the murder of Danielle Cretacci at 111 Ebling Avenue on August 27, 2019. *Id.* at 3-46. Campanella's nine-page affidavit, together with eleven

---

[2] The facts are taken from the search warrant and application, Docket Item 44-1, and the transcript of the evidentiary hearing conducted by Judge Schroeder on July 7, 2022, Docket Item 72. Based on Judge Schroeder's credibility findings, Docket Item 80 at 5, this Court credits the testimony of the hearing witnesses. *Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008) ("[A] district judge should normally not reject a proposed finding of a magistrate judge that rests on a credibility finding without having the witness testify before the judge") (quoting *Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999)).

exhibits, detailed the homicide and suspected burglary as well as the results of the investigators' efforts to identify a suspect. *Id.*

As explained in Detective Campanella's affidavit, law enforcement identified Rodriguez as a suspect through geo-location information for all Google-linked or Android devices near 111 Ebling Avenue around the time of the burglary and murder; anonymous device-identification numbers; and subscription and account records obtained from Google. *Id.* at 5-7. The warrant application noted that consistent with the satellite tracking information, a witness from the neighborhood observed a car like the one registered to Czosnyka and observed at Rodriguez's residence—a "'boxy SUV' with a loud muffler"—drive past the witness's house at about the same time. *Id.* at 7. The application also noted that Rodriguez placed two calls using Facebook messenger to the victim shortly before a neighbor heard gunshots on the night the crime occurred. *Id.* at 10, 32. And the application advised Judge Case that Rodriguez had recently moved to 120 Center Avenue in North Tonawanda; a green Jeep Grand Cherokee registered to Rodriguez's girlfriend, Czosnyka, was observed at that address; and Rodriguez and Czosnyka had been observed by law enforcement in the Jeep. *Id.* at 10.

Based on that and other information in the warrant application, Campanella sought a warrant to search Rodriguez, his residence, and the vehicle registered to his girlfriend. *Id.* at 10-11. And he asked for authorization to search for and seize:

> (1) [c]ellular telephones, computers, laptops, tablets, and any other electronic device capable of accessing Google; (2) firearms, firearm components, magazines, and ammunition consistent with the fired bullets and shell casings recovered at 111 Ebling Avenue, Tonawanda, New York; and (3) jewelry, cash, cellular telephone, and other merchandise belonging to Danielle Cretacci taken from 111 Ebling

> Avenue, Tonawanda, New York, on August 27, 2019 in the
> course of the [b]urglary and [h]omicide.

Docket Item 44-1 at 3.  Judge Case issued the search warrant on September 9, 2020,

at 1:36 p.m.  *Id*. at 2.

Law enforcement planned to execute the warrant on September 11, 2020, but

there was no plan to arrest Rodriguez.  Docket Item 72 at 9-10, 13-14.  As part of the

plan to execute the warrant, officers conducting surveillance of 120 Center Avenue and

the green Jeep Grand Cherokee alerted the North Tonawanda Police Department when

Rodriguez left his residence in that vehicle.  Based on the warrant to search the vehicle

and the person of Daniel Rodriguez, North Tonawanda police officers were asked to

stop the vehicle, and they did so.  *Id*. at 11-14.

The North Tonawanda officers identified the driver of the vehicle as Czosnyka

and the passenger as Rodriguez.  *Id*. at 14-15, 59.  They also observed that the vehicle

had tinted windows and switched license plates.  *Id*. at 15.   Once Detectives Scranton,

Muscoreil, and Campanella arrived on the scene, Czosnyka and Rodriguez were asked

to exit the vehicle.  *Id*. at 16.   Scranton spoke with Czosnyka; Muscoreil and

Campanella handcuffed Rodriguez, patted him down for any weapons, and took him to

stand near one of the detective vehicles.  *Id*. at 16 and 60-61.

Rodriguez clearly was "detained" and not "free to leave."  *Id*. at 32.  Campanella

therefore gave Rodriguez his *Miranda* warnings and asked Rodriguez whether he would

talk about the homicide.  *Id*. at 40 and 61.  Rodriguez initially agreed to speak with

Campanella but after answering only a few questions said that he did not want to talk

anymore.  *Id*. at 62.  Campanella then walked away to join Scranton at the Jeep Grand

Cherokee, and Muscoreil stayed with Rodriquez who remained handcuffed.  *Id*. at 62-63, 76.

While they were standing outside the police car, Muscoreil and Rodriguez engaged in small talk, discussing the COVID-19 pandemic and the NBA playoffs.  *Id*. at 63-64.  During that conversation, Rodriguez said, not in response to any questioning, that everything they were going to find in the vehicle belonged to him.  *Id*. at 64-65.  In response, Muscoreil asked whether law enforcement would find guns or drugs, and Rodriguez replied, "drugs."  Muscoreil asked whether law enforcement would find a lot or a little; Rodriguez replied, "just drugs"; and the conversation ended.  *Id*. at 65; Docket Item 95 at 6.  As Rodriguez predicted, drugs were found in the vehicle.  Docket Item 72 at 17.

A short time later, Rodriguez was turned over to the North Tonawanda Police Department and placed in the back of a marked patrol car.  *Id*. at 65-66.  While Rodriguez was in the car, he asked to speak with Detective Scranton, and as Scranton approached the car, a North Tonawanda police officer rolled down the back window so they could talk.  *Id*. at 18.  Rodriguez asked Scranton whether law enforcement intended to "search [Rodriguez's] house," Docket Item 72 at 18; *see* Docket Item 95 at 7, and Scranton responded, "[y]es, we ha[ve] a search warrant for the house," Docket Item 72 at 18-19; *see* Docket Item 95 at 7.  Rodriguez then told Scranton that anything they would "find at the house is mine."  Docket Item 72 at 19.  Scranton asked whether Rodriguez meant drugs, and Rodriguez said, "yes," *id*., and that "[t]hey are in my closet, with all of my clothes, in my jacket."  Docket Item 95 at 7.  Again, as predicted, law enforcement found drugs.  Docket Item 72 at 19.

7

## DISCUSSION

Rodriguez urges this Court to suppress his statements to Detectives Muscoreil and Scranton as well as the evidence seized from 120 Center Avenue.  Docket Item 85.

With respect to his statements, Rodriguez argues that his right to remain silent was not "scrupulously honored" twice—first by Muscoreil and then by Scranton.  *Id*. Rodriguez says that he invoked his right to remain silent and that Muscoreil violated that right by engaging him in small talk to gain his trust and make him comfortable enough to make incriminating statements.  *Id*. at 2-5.  And Rodriguez says that even though Scranton knew that Rodriguez had invoked his right to remain silent, Scranton resumed the interrogation without repeating *Miranda* warnings.  *Id*. at 5-6.

With respect to the search, Rodriguez says that any evidence found at 120 Center Avenue should be suppressed because the warrant issued by Judge Case lacked probable cause.  *Id*. at 7-9.  More specifically, Rodriguez argues that because the homicide that was the basis for the warrant "took place on April 27, 2019"—more than a year before the warrant application—any information was stale.  *Id*.  And he says that there was no connection between 120 Center Avenue and the homicide.  *Id*.

The government responds that after invoking his right to remain silent, Rodriguez voluntarily engaged in conversations with both Muscoreil and Scranton about what law enforcement officers would find in the Jeep and at 120 Center Avenue.  Docket Item 87 at 10-15.  More specifically, the government argues that even after a defendant invokes his right to remain silent, small talk, like that between Rodriguez and Muscoreil, is not the functional equivalent of interrogation and that law enforcement does not violate a defendant's right to remain silent by engaging in small talk.  Docket Item 93.  The

8

government says that Rodriguez's statements were volunteered and spontaneous. Docket Item 87 at 12. And the government argues that the search warrant was supported by ample probable cause and that even if it was not, law enforcement officers executed the warrant in good faith.[3]  *Id.* at 15-17.

At oral argument the parties disagreed about whether the small talk between Rodriguez and Muscoreil about COVID-19 and the NBA playoffs constituted the functional equivalent of interrogation. After the Court requested supplemental briefing on this issue, those submissions were timely filed by both sides. *See* Docket Items 93, 94. Now that briefing and oral argument on the objections are complete, the Court addresses the issues chronologically, reviewing and evaluating each step that occurred in connection with Rodriguez's separate statements to Muscoreil and Scranton and the search of 120 Center Avenue.

## I.    Right to Remain Silent

The Fifth Amendment provides, in relevant part, that "[n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. A custodial interrogation creates "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). The Supreme Court therefore has held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant

---

[3] In its response to Rodriguez's objections, the government does not address the staleness argument, focusing instead on the fact that law enforcement was authorized by Judge Case to search the entire house and that the drugs found in Rodriguez's coat in the closet would have been discovered without Rodriguez's statement to Detective Scranton. Docket Item 87 at 15-17.

unless it demonstrates the use of procedural safeguards effective to secure the privilege of self-incrimination."  *Id*. at 444.  "In particular, prior to the initiation of questioning, [law enforcement] must fully apprise the suspect of the [prosecution's] intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present … if [he] so desires.'"  *Moran v. Burbine*, 475 U.S. 412, 420 (1986), *quoting Miranda*, 384 U.S. at 468-470.

In *Rhode Island v. Innis,* the Court clarified what "interrogation" means:

> the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.  That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980); *see also United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011) ("[I]nterrogation consists of 'express questioning or its functional equivalent'").  Unsolicited statements or statements made spontaneously and voluntarily are generally exempt from the *Miranda* requirements because they are not the result of deliberate efforts by law enforcement to obtain information from a suspect.  *Miranda*, 384 U.S. 478; *Innis*, 446 U.S. 299-300.

If an individual subject to custodial police interrogation indicates that he "wishes to remain silent, the interrogation must cease."  *Michigan v. Mosley*, 423 U.S. 96, 100 (1975); *see United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir. 1996). "[T]he relevant inquiry is whether the defendant 'unambiguously' invoked his *Miranda* rights," including the right to remain silent.  *United States v. Plugh*, 648 F.3d 118, 124 (2d Cir. 2011) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)).  And "[a] suspect need not

rely on talismanic phrases or any special combination of words to invoke his Fifth Amendment right to remain silent."  *Ramirez*, 79 F.3d at 304.  "Once a suspect has unequivocally invoked his right to remain silent 'whether in the form of refusing to answer questions or asking that an ongoing interrogation be terminated, his request must be scrupulously honored.'"  *Id., quoting Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir. 1989).

Here, Rodriguez concedes that Detective Campanella read him his *Miranda* warnings and that he initially agreed to speak with law enforcement about a homicide investigation.  Docket Item 85 at 2-3.  Moreover, both sides agree that after answering a few questions, Rodriguez asked that the questioning stop and invoked his right to remain silent.  Docket Item 85 at 2; Docket Item 87 at 5-6; Docket Item 72 at 62.  What happened next is where their positions diverge.

### A.   Statements to Detective Muscoreil

Immediately after Rodriguez invoked his right to remain silent, Campanella walked away and Muscoreil stayed with Rodriguez.  Rodriguez claims that while he "uncomfortably stood near several police officers and detectives while his vehicle was searched on the side of the road," Muscoreil engaged him in conversation not to "befriend him or find out his opinions on the previous nights' basketball games" but instead to make him comfortable enough to share more information.  Docket Item 85 at 3.  In sharp contrast, the government characterizes the conversation between Detective Muscoreil and Rodriguez as "anodyne . . . small [] talk conversation about unrelated matters."  Docket Item 87 at 6.  Judge Schroeder agreed with the government that by "engag[ing] in general, social, sports conversation with [Rodriguez]," Muscoreil did not

violate Rodriguez's previously invoked right to remain silent.  Docket Item 80 at 6-7.

And this Court agrees as well.

At least three circuit courts have found that "[c]asual conversation is generally not

the type of behavior that police should know is reasonably likely to elicit an incriminating

response."  *Mickey v. Ayers*, 606 F.3d 1223, 1235 (9th Cir. 2010), *cert. denied*, 565 U.S.

952 (2011)*; see United States v. Tail*, 459 F.3d 854, 858 (8th Cir. 2006) ("[p]olite

conversation is not the functional equivalent of interrogation"); *United States v. Goist*, 59

Fed. App'x 757, 763 (6th Cir. 2003) (holding that statements made during the course of

"small talk" between defendant and agent were not the product of interrogation).  District

courts in the Second Circuit have reached a similar conclusion.  *See United States v.*

*Jacobson*, 4 F.Supp.3d 515, 523-33 (E.D.N.Y. 2014) ("[The officer] confined his

comments to small talk unrelated to defendant's case . . .  [and the officer's] small talk

about the weather and his family, for instance, were not reasonably likely to elicit an

incriminating response."); *United States v. Moody*, 2021 WL 202698, at *13 (W.D.N.Y.

Jan. 19, 2021) ("Although one of the officers responded to [the defendant's] question

about fantasy football, the response constituted nothing more than a courteous

response in no way designed to elicit an incriminating response.").

Rodriguez would have this Court find that after he invoked his right to remain

silent, Muscoreil engaged him in polite, courteous small talk not to pass the time in a

respectful way but to gain Rodriguez's trust and make him comfortable so that he would

divulge incriminating evidence.  Docket Items 85, 94.  But unlike *United States v.*

*Barone,* 968 F.2d 1378, 1380-82 (1st Cir. 1992), the case on which Rodriguez relies to

make that argument, *see* Docket Item 94 at 2-3, there is nothing in the record to support

the assertion that law enforcement had some ulterior motive.  Likewise, nothing about

the small talk seemed designed to elicit anything incriminating, let alone Rodriguez's

unsolicited and spontaneous statement while the Jeep was being searched that

everything in the Jeep was his.  And that volunteered statement is precisely the sort of

statement that is exempt from *Miranda's* requirements because it was not the result of

law enforcement questioning.[4]

What happened next is the only aspect of Rodriguez's encounter with Muscoreil

that gives this Court the slightest pause.  In response to Rodriguez's unsolicited,

spontaneous statement, Muscoreil asked whether law enforcement would find guns or

drugs, and Rodriguez replied "drugs."  Docket Item 72 at 65; Docket Item 95 at 6.[5]

Although it is a close question, this Court agrees with Judge Schroeder's conclusion

that under the circumstances of an ongoing homicide investigation, Muscoreil's follow-

---

[4]   *See Moody*, 2021 WL 202698 at *12-13 ("[the statements] were likewise
unsolicited and uttered by [the defendant] while the officers conversed with one another
as they conducted the search. Although one of the officers responded to Moody's
question about fantasy football, the response constituted nothing more than a courteous
response in no way designed to elicit an incriminating response"); *Jacobson*, 4
F.Supp.3d at 532-33 ("[the officer] confined his comments to small talk unrelated to
defendant's case; [the officer's] small talk about the weather and his family, for instance,
were not reasonably likely to elicit an incriminating response"); *see also Mickey*, 606
F.3d at 1235 ("[c]asual conversation is generally not the type of behavior that police
should know is reasonably likely to elicit an incriminating response"), *cert. denied*, 565
U.S. 952 (2011); *Tail*, 459 F.3d at 858 ("[p]olite conversation is not the functional
equivalent of interrogation"); *Goist*, 59 F. App'x at 763 (holding that statements were not
the product of interrogation when made during the course of "small talk" between
defendant and agent).

[5] Detective Muscoreil also asked whether law enforcement would find a lot or a
little, and Rodriguez replied, "just drugs," before the conversation ended.  Docket Item
72 at 65; Docket Item 95 at 6.  Because Muscoreil's second follow-up question may well
have crossed the line between questions designed to protect the officers and questions
designed to solicit incriminating evidence, the Court will suppress only that question and
answer, which, in any event, add little or nothing to what already was said.

up question was a legitimate application of the public safety exception to *Miranda*.  "In *New York v. Quarles*, the Supreme Court identified a 'narrow exception to the *Miranda* rule,' when arresting officers ask a defendant 'questions necessary to secure their own safety or the safety of the public.'"  *United States v. Newton*, 369 F.3d 659, 677 (2d Cir. 2004); *see also United States v. Estrada*, 430 F.3d 606, 612 (2d Cir. 2005); *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011).  Because Muscoreil's question asked whether weapons might be found during an ongoing search, it fits within that narrow exception.

In sum, there was nothing about Muscoreil's polite small talk that violated Rodriguez's rights, and Rodriguez's motion to suppress his volunteered statement to Muscoreil is therefore denied.

**B.     Statements to Detective Scranton**

Rodriguez also argues that his interaction with Detective Scranton violated his Fifth Amendment rights.  *See* Docket Item 85 at 5-6.  That conversation took place after Rodriguez asked to speak with Scranton when Rodriguez was sitting in the back seat of a police car, and Rodriguez says that Scranton was required to give *Miranda* warnings again before agreeing to speak with him.  *Id.*  Rodriguez cites *Perkins v. Herbert*, 596 F.3d 161, 174 (2d Cir. 2010), to argue that after a suspect invokes his right to remain silent, "[i]nterrogation can resume 'only where a significant period of time has passed … *and where the police have reiterated the requisite warnings*."  Docket Item 85 at 5 (emphasis in original).

But that argument fails, and *Perkins* is inapposite, because law enforcement never "resume[d]" interrogation here.  On the contrary, Rodriguez initiated the

conversation with law enforcement when he asked to speak with Scranton while Rodriguez was sitting in the patrol car.  Docket Item 72 at 18.   After the North Tonawanda police officer rolled down the back window, Rodriguez asked Scranton whether law enforcement intended to "search [Rodriguez's] house," and Scranton responded, "[y]es, we ha[ve] a search warrant for the house."  Docket Item 72 at 18-19; *see* Docket Item 95 at 7.  Rodriguez then volunteered that what they would find at the house was his.  Docket Item 72 at 19.  And when Scranton asked whether Rodriguez meant drugs, Rodriguez said yes and told Scranton where the drugs would be found. *Id.; see* Docket Item 95 at 7.  So the only question Scranton asked sought clarification of what Rodriguez had volunteered, and only a strained definition of interrogation might include that sort of question.[6]

In sum, the safeguards of *Miranda* and its progeny come into play only when a defendant who is in custody is subjected to police interrogation or its functional equivalent.  *See Miranda*, 384 U.S. at 444; *Innis*, 446 U.S. at 300-01; *see also United States v. FNU LNU*, 653 F.3d at 148 ([I]nterrogation consists of express questioning or its functional equivalent").  Unsolicited statements—spontaneous, voluntary statements like those made to Detective Scranton—do not fall under the *Miranda* umbrella because they are not the result of police questioning.  *See Moody*, 2021 WL 202698 at *13.  So because Rodriguez's statements to Scranton were volunteered—and, indeed, because

---

[6] For the reasons stated above, *see supra* at 13-14, Scranton's question also might have been permitted by the public safety exception.

Rodriguez initiated the conversation with Scranton by asking to speak with him—

Scranton did not violate Rodriguez's rights in any way.

## II.      Search of 120 Center Avenue

The Fourth Amendment guarantees "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures."

U.S. Const. amend. IV.  "To establish probable cause to search a residence, two factual

showings are necessary—first, that a crime was committed, and second, that there is

probable cause to believe that evidence of such crime is located at the residence."

*United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983).  In deciding whether to

issue a search warrant,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (internal citations omitted).

In fact, because warrants are preferred,

>  a [party] who argues that a warrant was issued on less than probable cause faces a heavy burden.   '[W]here [the] circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner.... [T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.

*Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991), *quoting United States v. Ventresca,* 380 U.S. 102, 109 (1965).  Moreover, "[a] reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists."  *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993); *see also United States v. Nichols,* 912 F.2d 598, 602 (2d Cir.1990) (search warrant); *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983) (search warrant).

Rodriguez argues that the information in Campanella's application for a warrant to search 120 Center Avenue lacked probable cause, and the warrant therefore was invalid, for two reasons: first, the information was stale, and second, there was an insufficient nexus between 120 Center Avenue and the alleged criminal activity.  Docket Item 85 at 7-8.  More specifically, Rodriguez argues that the information linking him to an alleged burglary and homicide was more than a year old when it was presented to Judge Case and that there was no reason to believe that evidence of that crime would be found at 120 Center Avenue where Rodriquez had moved only recently.  *Id*. at 8.

The Second Circuit looks at "[t]wo critical factors" in determining whether the information in a search warrant application is stale: 1) the time elapsed between the criminal activity and the application for a warrant; and 2) the type of crime involved.  *United States v. Ortiz*, 143 F.3d 728, 732 (2d Cir. 1998).  Moreover, "there is no bright-line rule for staleness."  *United States v. Boles*, 914 F.3d 95, 105 (2d Cir. 2019).  So the question here is whether the lapse of time or the absence of a connection between the items sought and the place to be searched precluded a finding of probable cause.  And the answer is no.

Campanella's affidavit described in detail the technology that enabled law enforcement to establish that Rodriguez was near 111 Ebling Avenue, the victim's home and the scene of the crime, around the time of the burglary and homicide and why that technology made Rodriguez a suspect. Docket Item 44-1 at ¶¶ 5, 16-33. For example, the affidavit not only detailed the evidence that placed Rodriguez near the scene when the crime occurred, *id.,* but it also noted that Rodriguez had placed two calls to the victim at 1:25 a.m. and 1:30 a.m., *id.* at ¶ 32, minutes before a neighbor heard five gunshots, *id.* at ¶ 10. It also noted that another neighbor saw a car that fit the description of a car associated with Rodriguez near the crime scene at about the same time. *Id.* at ¶¶ 11, 26. In addition, Campanella's affidavit detailed evidence that might be found with the person who committed the crime: the victim's missing cell phone and jewelry as well as a firearm or firearms that might be linked to shell casings and bullets found at the scene of the crime. *Id.* at ¶¶ 37-40. And Campanella's affidavit provided good evidence that Rodriguez had recently moved to the lower unit at 120 Center Avenue. *Id.* at ¶¶ 41-44.

So the warrant application explained why Rodriguez was a suspect in the murder and burglary, noted where Rodriguez now lived, and detailed the evidence that might be found with the person who committed the crime. The search warrant issued by Judge Case authorized law enforcement to search for and seize three categories of evidence consistent with that application: any electronic devices capable of accessing Google and placing Rodriguez at the crime scene; firearm evidence connected to the four fired shell casings and four fired bullets recovered from the crime scene; and the personal property of the victim, including her jewelry and her cell phone. *Id.* at ¶¶ 34-40.

There is no question that the time between the crime and the application for the warrant to search 120 Center Avenue was more than a year, but it undoubtedly took considerable time for law enforcement to gather the evidence presented in the warrant application. Indeed, Campanella's nine-page affidavit and ten attached exhibits detail a painstaking investigation involving Google location records, cell-site GPS location data, and Facebook records. So there is no reason to believe that law enforcement was at fault for the lapse of time between the crime and the warrant application.

And given the nature of the crimes and the evidence sought, Rodriguez's arguments about the lack of any connection between 120 Center Avenue and the murder and burglary miss the mark. Police were looking for a weapon and stolen items that they had not been able to find, and they identified Rodriguez as a suspect. So even though Rodriguez had moved to 120 Center Avenue only recently and a year had passed since the murder and burglary, there still was reason to believe that those items would be found there. Because the police had not recovered the items, they probably were still with the person who committed the crime; Rodriguez was suspected to be that person; and Rodriguez now lived at 120 Center Avenue.

For all those reasons, the warrant application was not stale, and there was ample connection to the location searched. Especially because "[a] reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists," *see Wagner,* 989 F.2d at 72, this Court cannot and will not second guess Judge Case's decision to issue the warrant.

Judge Schroeder also concluded, *see* Docket Item 80 at 15, and the government urges, *see* Docket Item 87 at 17, that even if the search warrant fails for a lack of

probable cause, the good faith exception precludes suppression.  This Court again

agrees.  Under *United States v. Leon*, 468 U.S. 897, 921 (1984), when law enforcement

genuinely believes that it has obtained a valid warrant and executes that warrant in

good faith, even if the warrant later is determined to be invalid, there is no violation of

the Fourth Amendment sufficient to justify suppression.  *See id.,* 468 U.S. at 922.

Because the law enforcement officers who executed the warrant at 120 Center Avenue

acted with the good faith belief that they had a valid warrant, this Court still would not

suppress the evidence found even if the warrant were invalid.

### CONCLUSION

Rodriguez's response "just drugs" to Detective Muscoreil's question whether law

enforcement would find a lot or a little in the Jeep, *see supra* at n. 5, is suppressed.  But

for the reasons stated above and in Judge Schroeder's RR&O, Rodriguez's motions to

suppress his statements and the evidence seized from 120 Center Avenue, Docket

Items 19 and 43, are otherwise DENIED.

SO ORDERED.

Dated:      May 3, 2023
            Buffalo, New York

*s/Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE